**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-cv-21107-FAM**

SALVATORE SACCOCCIO, on behalf of
himself and all others similarly situated,

        Plaintiff,

v.

JP MORGAN CHASE BANK, N.A.,
individually and as successor in interest to CHASE
HOME FINANCE, LLC; CHASE HOME FINANCE,
LLC; CHASE INSURANCE AGENCY, INC.;
ASSURANT, INC.; AMERICAN SECURITY
INSURANCE COMPANY; STANDARD GUARANTY
INSURANCE COMPANY; and VOYAGER
INDEMNITY INSURANCE COMPANY,

        Defendants.

_____/

**PLAINTIFF'S MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENT AND**
**FOR CERTIFICATION OF THE SETTLEMENT CLASS**

## INTRODUCTION

The Parties to this action have negotiated an unprecedented settlement that provides more than $300 million in financial benefits to Chase mortgagors nationwide who had hazard insurance placed on their properties and ends insurance practices we allege have unjustly enriched the Defendants by more than $1 billion over the past five years.[1] Undersigned counsel have been investigating these specific practices since November 2010 -- reviewing more than three million documents and taking more than thirty depositions -- when these exclusive relationships between the major banks and two insurers that control more than 99% of the market for force-placed insurance were first publicly disclosed.[2]

Plaintiff Saccoccio filed his claims against the Chase and Assurant Defendants in June 2012.   The parties have reached a settlement that will provide significant monetary and injunctive relief to the nationwide class.  The Settlement will require the Defendants to: (1) pay cash refunds of 12.5% of the net annual premium to class members who paid their premiums, and (2) credit 12.5% of the net annual premium back to class members who were charged for force-placed insurance, but never made payments. The Settlement will also enjoin Defendants from continuing with these alleged wrongful practices.   These benefits were the result of significant hard-fought, arms'-length negotiations between the parties and their counsel, and are particularly valuable considering the significant hurdles faced by Plaintiff and the Class.  In light of these hurdles, and the immediate benefits the Settlement will provide the Class, there can be no question that the terms of the proposed Settlement are within "the range of reasonableness."

---

[1] Plaintiff  and Defendants J.P. Morgan Chase Bank, N.A., Chase Home Finance, LLC, and Chase Insurance Agency, Inc. (the "Chase Defendants") and Assurant Inc., American Security Insurance Company, Standard Guaranty Insurance Company, and Voyager Indemnity Insurance Company (the "Assurant Defendants"), executed a Settlement Agreement on August 26, 2013. The Settlement Agreement is attached hereto as **Exhibit A** and the Preliminary Approval Order is attached as **Exhibit B**.

[2] This is the second lender-placed class action to settle before this Court. The Final Fairness hearing in the first case, *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233-RNS (S.D. Fla.) is schedule for September 11, 2013.

## FACTUAL BACKGROUND

1.   **Defendants' Force-Placed Insurance Practices**

The standard form mortgage agreements used by the Chase Defendants require the borrower to maintain hazard and wind insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse.  (D.E. 1 ¶¶ 34, 51, 85.)  The mortgage agreement authorizes the lender to obtain coverage to protect it against risk of loss, and either advises the borrower that the cost of the coverage obtained might significantly exceed the cost of the borrower's voluntary coverage or provides that the lender may pay the costs necessary to protect its rights in the property. (*Id.* ¶¶ 51, 85.)

Plaintiff Saccoccio had hazard coverage force placed on his property by a Chase defendant.  (*Id.* ¶¶ 50, 54, 59, 67, 75, 77, 84, 86.)  He does not question Chase's contractual right to force place coverage in the first instance, but instead challenges its arrangement with Assurant and its subsidiaries American Security Insurance Company ("ASIC"), Standard Guaranty Insurance Company ("SGIC"), and Voyager Indemnity Insurance Company ("Voyager") to artificially inflate borrowers' premiums with costs well beyond the cost of coverage. (*Id.* ¶ 49.) These costs include kickbacks to Chase Insurance and other affiliates, reinsurance commissions and payments, and other costs unrelated to the procurement of new coverage. (*Id.* ¶¶ 39-41, 48.)

Plaintiffs alleges that Defendants' scheme operates as follows.  Chase purchases master or "umbrella" policies to cover its entire portfolio of mortgage loans from Assurant and its subsidiaries.  (*Id.* ¶ 37.)  In exchange, the Chase gives its insurers the exclusive right to force new coverage on borrowers' properties in the event of a lapse or the detection of insufficient coverage.  (*Id.*)  The Assurant Defendants monitor Chase's mortgage loan portfolio to identify these lapses, and when one is identified, ASIC, SGIC, or Voyager sends notice to the borrower that new, lender-placed coverage will be purchased if voluntary coverage is not continued.  (*Id.*) If the lapse continues, the insurer notifies the borrower that new coverage is being placed at his or her expense.  (*Id.*)  Plaintiff alleges that these letters are inaccurate, as the lender-placed coverage goes into effect automatically on the day of the lapse under Chase's umbrella policy with the Assurant Defendants.  (*Id.* ¶ 37, 38, 86, 88.)

Premiums for the new coverage are deducted from the borrower's escrow account or added to the balance of the subject mortgage loan.  (*Id.* ¶ 39.)  Plaintiff alleges that the premium

amount covers more than the cost of coverage—it also covers kickbacks to Chase Insurance, which are labeled as "commissions" even though Chase Insurance does no work to procure or place coverage for individual borrowers.  (*Id.* ¶¶ 40, 41, 48.)  Amounts arising from subsidized servicing costs, reinsurance payments and commissions, and other impermissible costs are also embedded in the premiums without borrowers' knowledge or consent.  (*Id.* ¶¶ 43-46, 48, 57, 70, 81, 88.)  Chase also charges amounts for duplicative coverage placed during periods covered by Standard Mortgage Clauses or Lender's Loss Payable Endorsements, which typically protect the lender for a period of at least ten days after the termination of a borrower's voluntary policy, (*id.* ¶ 46), and for retroactive coverage for periods when no claims were made, (*id.* ¶¶ 69, 77-78, 86).

## 2.      The *Herrick* Litigation

Plaintiff Saccoccio filed claims challenging the Chase and Assurant Defendants' force-placed hazard insurance scheme in June 2012, in the action captioned *Barreto v. JPMorgan Chase Bank, N.A.*, No. 12-cv-22053 (S.D. Fla.).  The *Barreto* plaintiffs sought centralization of all force-placed insurance litigation pending nationwide in a multidistrict proceeding, but the Judicial Panel on Multidistrict Litigation (the "Panel") denied their motion, urging all parties in force-placed litigation to "continue to employ alternatives to transfer which may minimize the risk of duplicative discovery and inconsistent pretrial rulings." *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388 (J.P.M.L. 2012) (D.E. 262).  Plaintiffs' counsel in *Barreto* heeded the Panel's call, and joined forces with plaintiffs' counsel in other actions to bring their clients' claims together before this Court in *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.).

Plaintiffs in *Hall* brought their consolidated class action complaint on November 23, 2012.  In March 2013, this Court ordered Plaintiffs to re-file their case in five separate pleadings so that there would be one action pending against each mortgage lender and its force-placed insurer, and that all five of these cases would be handled in a coordinated manner before this Court. *See Hall*, No. 12-cv-22700 (D.E. 177).

The *Herrick* Plaintiffs brought claims against the Chase and Assurant Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a business relationship, and violations of FDUTPA, the federal Bank Holding Company Act, and TILA.  (D.E. 1 ¶¶ 106-184.)  The other four plaintiffs brought claims based on the forced placement of wind insurance by the Chase Defendants; Mr. Saccoccio's claims arose from the forced placement of hazard

insurance on his property.  (*Id.* ¶¶ 50-91.)  All of these claims arose from the Chase and Assurant Defendants' exclusive arrangements regarding the forced placement of insurance coverage on mortgagors' properties, and the inflated premiums and excessive coverage that they impose on homeowners whose "voluntary" property insurance has lapsed.  (*Id.* ¶¶ 106-184.)  Undersigned counsel have been litigating claims involving the Assurant Defendants' (and different mortgage lenders') force-placed practices for almost two years in the other litigation before this Court.

 Defendants moved to dismiss all claims against them earlier this year.  Those motions were fully briefed, and the Court denied them in their entirety, but with leave to re-file after additional discovery on the filed-rate doctrine, among other things.  (D.E. 49.)  At the hearing on the motions to dismiss, the Court also announced its intention to try the *Herrick* action by the end of this year, but indicated that it believed that the Defendants had "ma[de] some very good arguments" which it would consider for summary judgment.  (May 16, 2013 Hrg. Tr. at 92:21-23).

The Chase Defendants also moved to stay the force-placed wind insurance claims brought by Mr. Saccoccio's co-plaintiffs pending approval of the nationwide class action settlement of all force-placed wind insurance claims against the Chase and Assurant Defendants in *Pulley v. JPMorgan Chase Bank, N.A.*, No. 12-cv-60936 (S.D. Fla.), pending before Judge Cohn in the Southern District of Florida.  (D.E. 20.)  After hearing argument on the motion, the Court granted a stay of all claims in *Herrick* until July 1, 2013, ruling that "[i]f Judge Cohn[] approves the Class Action Settlement on the wind claims, wind claims will be severed from this action, and the case will proceed as to the hazard claims."  (D.E. 49.)  Judge Cohn granted the *Pulley* settlement preliminary approval on June 26, 2013, and conditionally certified a settlement class of all mortgagors nationwide who had force-placed wind insurance coverage placed on their properties by the Chase Defendants between January 1, 2008 and March 4, 2013.  *See* Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Jun. 26, 2013, *Pulley*, No. 12-cv-60936 (S.D. Fla.), attached as **Exhibit C.**

Plaintiff Saccoccio announced his settlement with Chase of all hazard claims nationwide two weeks later, on July 12, 2013, and on August 12th this Court stayed litigation of the hazard claims pending approval of the settlement.   (D.E. 54.)  Pursuant to the settlement terms, and in accordance with the Court's ruling that the wind claims be severed from this action upon approval of the settlement in *Pulley*, Plaintiff Saccoccio (with the consent of all Defendants) has

filed an Amended Complaint limiting these proceedings to litigation of his force-placed hazard insurance claims against the Chase and Assurant Defendants.  A copy of the Amended Complaint is attached as **Exhibit D**.

### 3.  <u>The Saccoccio Mediation</u>

Soon after the Court announced its intention in May 2013 to try the *Herrick* claims by year's end, the parties began to mediate only Plaintiff Saccoccio's hazard claims with mediator Rodney Max (the "Saccoccio Mediation").  (Declaration of Rodney A. Max, attached as **Exhibit E**, at ¶ 10.) Mr. Max has significant experience mediating complex business disputes, including nationwide class actions with insurance companies, and has focused his legal practice on mediation for more than twenty years.  (*Id.* ¶¶ 3-9.)

The Saccoccio Mediation began in May 2013 with numerous face-to-face and telephonic conferences among the parties to discuss initial positions and the structure of the mediation, and continued through late August 2013.  (*Id.* ¶¶ 10-12.)  The parties participated in three, in-person mediation sessions overseen by Mr. Max, on May 21st, June 15th, and June 26th, attended by both Chase and Assurant representatives, and negotiated the terns of a nationwide class action settlement at arms' length.  (*Id.* ¶¶ 12, 13, 16, 19.) The sessions involved discussions in various combinations among Mr. Max, all counsel, and representatives of the Chase and Assurant Defendants, including extended conferences with each side, bi-lateral discussions with counsel, and *ex parte* discussions by Mr. Max with the parties concerning their various positions. (*Id.* ¶¶ 11, 12, 13, 16.)  The discussions allowed the parties to express their respective views of the strengths and weaknesses of the respective positions in the case. (*Id.* ¶ 16.)

In the time between the three sessions, Plaintiff's counsel requested numerous additional documents and presented written questions to the Chase and Assurant Defendants, to which Defendants responded before the second session convened. (*Id.* ¶ 13.)  The parties also continued to negotiate by telephone, also with Mr. Max's participation, in the intervening time.  (*Id.* ¶¶ 13, 18.)  By the end of the third session, the parties had reached a settlement in principle and agreed to sign off on a settlement outline memorializing the essential settlement terms.  (*Id.* ¶¶ 13, 16.) Defendants also produced additional documents and data during mediation, allowing Plaintiff's counsel to confirm certain aspects of the settlement and to assess and confirm the value of the relief that the settlement would provide to the class. (*Id.* ¶ 13.)  Plaintiff's counsel tested the data provided and other aspects of Defendants' force-placed hazard insurance program, policies, and

procedures during depositions of key Assurant and Chase corporate representatives. (*Id.*) Over the course of the following month, up to and including August 26, 2013, the parties continued their negotiations with Mr. Max's participation, communicating several times a week to negotiate and finalize the terms of their Settlement Agreement and other issues, and executing the Settlement Agreement on August 26, 2013. (*Id.* ¶¶ 13, 18; Ex. A.) The mediation, and Mr. Max's involvement in the process, concluded on August 26, 2013. (*Id.* ¶ 12, 18.) All told, Mr. Max dedicated more than thirty hours to facilitating negotiations among the parties. (*Id.* ¶ 15.)

## 4. **The Settlement Terms and Agreement**

### A. *The Proposed Class*

The Settlement Agreement provides relief to all borrowers nationwide who were insureds under a hazard LPI policy placed on residential property through the Chase Defendants between January 1, 2008 and the preliminary approval date (the "Class Period"), and either paid the Chase Defendants the premium for the policy or were charged a premium and still owe some portion or all of the amount charged. (Ex. A ¶ 2.47.) This class will include borrowers whose homes are in foreclosure and short sale, as well as those who were granted a deed in lieu of foreclosure or have modified the terms of their loans.[3]

### B. *Monetary and Injunctive Relief*

The Settlement Agreement affords these class members significant monetary relief, and enjoins both the Chase and Assurant Defendants from continuing to inflate the charges imposed on mortgagors for a period of six years. (*Id.* ¶¶ 4.2, 4.3, 4.5.) The monetary relief will compensate class members for a significant part of the inflated portion of the force-placed hazard premiums that they either paid or were charged. All class members who submit a valid claim form will recover 12.5% of the net premium *charged* to the class member during the class period, less any refund credited them, regardless of whether the class members paid any portion of that premium to Chase.[4] (*Id.* ¶¶ 2.30, 4.5.2, 4.5.3.) The 12.5% payment is taken from the

---

[3] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded numerous categories that are included in this Settlement from the class of Florida borrowers that it certified in February 2012. *Williams,* No. 11-cv-21233 (S.D. Fla. Feb. 21, 2012) (D.E. 211).

[4] A claims-made process is appropriate here, as the Chase and Assurant Defendants have represented that they cannot, on a system-wide basis, determine the amount of force-placed premiums paid or currently owed by a borrower, or the number of loans that are in foreclosure,

entire premium, rather than the "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, were applied to pay for insurance to cover the borrower's property. Qualified class members who paid their premiums will receive a check from Chase for the full settlement amount. (*Id.* ¶ 4.5.3.) Class members who were charged but did not pay will either receive a check or have the amount credited to their Chase escrow account. (*Id.* ¶¶ 4.5.2.)

The injunctive relief provided by the Settlement Agreement will put an end to numerous force-placed hazard insurance practices that are the subject of this lawsuit. The Settlement Agreement enjoins the Chase and Assurant Defendants from continuing to charge what Plaintiff alleges are inflated premiums for force-placed insurance. For a period of six years following the Final Settlement Date, Chase will accept no financial interest in the placement of force-placed hazard policies other than the premium itself and the protection afforded it by the hazard coverage. (Ex. A ¶ 4.2.1.) The Settlement Agreement prohibits the Chase Defendants and their affiliated companies from accepting commissions on force-placed hazard insurance; from entering into quota-share reinsurance arrangements with Assurant or any other insurer; from accepting payments from any forced-placed insurer or vendor for administrative or other services related to forced-placed insurance; and from accepting below-cost or free outsourced services provided by LPI insurers or vendors. (*Id.* ¶ 4.2.2.) The Assurant Defendants will similarly be prohibited for a period of six years from providing force-placed hazard commissions to Chase-affiliated agents or brokers, hazard quota-share reinsurance arrangements, and payments for any administrative or other service associated with force-placed hazard policies, and from accepting from Chase payments for below-cost or free outsourced services. (*Id.* ¶ 4.3.)

The Settlement also binds Chase to establish lender-placed hazard coverage at the last known coverage amount or the unpaid principal balance on a borrower's loan, so that lender-placed coverage moving forward bears some relation to the value of the interest being protected. (Ex. A ¶ 4.2.4.) Chase will also advance funds in the event of a lapse to continue coverage under the borrower's voluntary policy, (*id.* ¶ 4.2.5), thus further ensuring that the cost of coverage bears some relation to the collateral's value and also reducing the number of lender-placed policies issued by Chase and Assurant. Finally, the Settlement terms require Chase to refund any

---

or have been modified or refinanced. The claims that are filed will describe that specific information.

amounts due the borrower once voluntary insurance is put back in place within fifteen days of receipt of evidence of the voluntary coverage. (*Id.* ¶ 4.2.6.)

### C. *Release of Claims against Defendants*

In exchange for the relief provided by the Settlement, members of the Settlement Class will release the Chase and Assurant Defendants, as well as their former and current subsidiaries, affiliates, divisions, parents, and other affiliated companies, among others, from all claims, obligations, or damages that were or could have been sought in this litigation or that "relate, concern, arise for or pertain in any way to [Defendants'] conduct, policies, or practices concerning hazard LPI Policies placed by Chase during the Class Period." (*Id.* ¶ 10.1.)

### D. *Class Notice*

Class members will receive notice of the settlement by first-class mail at their last known mailing address in the form of notice attached to the Settlement Agreement as Exhibit A, assuming that form is approved by the Court.[5] (*Id.* ¶ 6.1.) The notice will be mailed no less than ninety days before the date set for the final approval hearing. (*Id.* ¶ 6.3.) The Settlement Administrator will also establish a website on which Class Members may download a claim form and review the Settlement Agreement and its accompanying exhibits. (*Id.* ¶ 6.5.) The site will provide a toll-free number that class members may call for information about the settlement, or to leave a message for class counsel with questions or concerns. (*Id.* ¶ 6.5, 7.2.1.) Class members may opt out of the settlement by sending a request for exclusion to the Settlement Administrator. (*Id.* ¶ 11.1.)

### E. *Claims Process*

To obtain relief from Defendants, class members will be required to submit a claim form on or before a deadline that will be set by the Court, but that will fall no later than sixty days after the Final Settlement Date. (*Id.* ¶ 2.7.) The claims will be reviewed and approved by the Settlement Administrator, who will then make a determination of the amount owed each class member using Defendants' electronic records, and then have 180 days after the Final Settlement Date to distribute the monetary relief provided for by the Settlement. (*Id.* ¶ 7.2, 7.3.3.)

---

[5] In the event that a notice is returned as undeliverable, the Settlement Administrator will access the National Change of Address database in an attempt to locate the class member in question. (*Id.* ¶ 6.4.)

### F. *Class Counsel Fees and Expenses and Named Plaintiff Case Contribution Award*

The parties stipulate in the Settlement Agreement that the law firms of Kozyak Tropin & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP will serve as Class Counsel for the settlement class. (Ex. A ¶ 2.12.) Pursuant to Section 15.1 of the Settlement Agreement, Class Counsel's application for attorneys' fees and expenses shall not exceed $20,000,000.00. (*Id.* ¶ 15.1.) Defendants will also pay Plaintiff Saccoccio a Case Contribution Award not to exceed $5,000.00. (*Id.* ¶ 15.4.) These amounts will be roughly 5% of the available Settlement benefits, well below any reported class decision on fees in any reported decision. The Court will consider whether to grant or deny these awards separate and apart from its consideration of the fairness, reasonableness, and adequacy of the settlement at the Final Fairness hearing. (*Id.* ¶ 15.5.)

## LEGAL ARGUMENT

### I.   THE COURT SHOULD ENTER AN ORDER GRANTING PRELIMINARY APPROVAL OF THE CHASE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted). For these reasons, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir.1992). Keeping this policy in mind, settlement approval is "committed to the sound discretion of the district court." *U.S. Oil & Gas Litig.*, 967 F.2d at 493; *see Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988) ("When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements.") (citations omitted).

"Approval of a class action settlement is a two-step process." *Fresco v. Auto Data Direct, Inc.*, No. 03-cv-61063, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007). Preliminary approval is the first step, requiring the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id.* (citation omitted). In the second step, after notice to the class and time and opportunity for absent class members to object

or otherwise be heard, the court considers whether to grant final approval of the settlement as fair and reasonable. *Smith*, 2010 WL 240119, at *2.

The standard for preliminary approval of a class action settlement is not high—a proposed settlement should be preliminarily approved if it falls "within the range of possible approval" or, otherwise stated, if there is "probable cause" to notify the class of the proposed settlement and "to hold a full-scale hearing on its fairness[.]" *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (quoting MANUAL FOR COMPLEX LITIGATION § 1.46 at 62, 64-56 (5th ed. 1982)). Applying this standard, courts in this district routinely grant preliminary approval of class action settlements with similar facts. *See, e.g., Singleton v. Gen. Revenue Corp.*, No. 12-cv-20025, 2013 WL 151181 (S.D. Fla. Jan. 14, 2013); *In re Checking Account Overdraft Litig.*, MDL No. 2036, 2012 WL 4173458 (S.D. Fla. Sept. 19, 2012); *David v. Suzuki Motor Corp.*, No. 1:08-cv-22278, 2010 WL 623662 (S.D. Fla. Feb. 3, 2010); *In re Managed Care Litig.*, MDL No. 1334, 2003 WL 22218324 (S.D. Fla. May 30, 2003).

An inquiry into the ultimate fairness of the Settlement is not necessary at this time, because there will be a further hearing at which the fairness of the Settlement will be addressed, after notice to the Class. Therefore, even if there are aspects of the proposed settlement that raise questions, those questions "should not derail the orderly workings of the settlement process at this point." *Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. at 1386. "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies, and the settlement falls within the range of reason." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) (citing *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 240119, at *2 (S.D. Fla. June 15, 2010)).

Here, the proposed settlement is the product of arm's-length negotiations before an experienced and respected mediator by counsel with significant experience in complex class action litigation, carries no "obvious deficiencies," and falls well within the range of reason. The Court should accordingly enter an order granting preliminary approval.

### A. The Saccoccio Settlement Is the Product of Good Faith, Informed, and Arms'-Length Negotiations among Experienced Counsel.

At the preliminary approval stage, district courts consider whether the proposed settlement appears to be "'the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel' and not 'the result of collusion[.]'" *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (citation

10

omitted).   Courts begin with a presumption of good faith in the negotiating process.   *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) ("Absent evidence of fraud or collusion, such settlements are not to be trifled with"); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement"); *In re Rio Hair Naturalizer Prods. Liab. Litig.*, No. MDL 1055, 1996 WL 780512, at \*14 (E.D. Mich. Dec. 20, 1996) ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary."); MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42 ("a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel").

The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arms' length.   The parties participated in three in-person mediation sessions before Rodney A. Max, as well as regular telephonic sessions and email communications over the course of several months, negotiating first the terms of an initial memorandum of understanding and then a settlement agreement reflecting the final terms.   (Max Decl. ¶¶ 11-14, 18).   Mr. Max has significant experience mediating complex commercial suits to resolution, (*id.* ¶¶ 2-9), and the very fact of his involvement weighs in favor of preliminary approval.   *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of court appointed special master to oversee mediation efforts evidenced the procedural fairness of the negotiating process); *In re AMF Bowling*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004) (the participation of such a neutral and respected mediator … in the settlement negotiation process "gives [the court] confidence that [the negotiations] were conducted in an arm's-length, non-collusive manner"); *Carnegie v. Mut. Sav. Life Ins. Co.*, No. Civ. A. 99S3292NE, 2004 WL 3715446, at \*18 (N.D. Ala. Nov. 23, 2004); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at \*6 (S.D.N.Y. 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion in the negotiating process); *Schwartz*, 2005 WL 3148350, at \*21 (noting that the parties' use of a mediator evidenced the non-collusive nature of their negotiations); *In re Cardizean CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (same); *Great Neck*

*Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*, LLP, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (same).

Mr. Max was involved at every stage of the process. He began to confer with the parties in early May 2013 and facilitated settlement at every step, meeting with each party at the start to discuss the case and their initial positions, structuring the mediation, facilitating negotiation of the material terms of the Settlement, helping the parties to revise and finalize the agreement itself, and overseeing its execution, among other things. (Max Decl. ¶¶ 10-19.) Representatives of both defendant groups attended the two substantive live mediation sessions, and all parties were represented by experienced counsel who have years of experience litigating force-placed insurance class actions, as well as other complex class action litigation. (*Id.* ¶¶ 12, 19); *see* p. 25, *infra*.

The parties' extensive negotiations were also informed by considerable discovery. Class counsel has been litigating force-placed insurance claims involving the Assurant Defendants in this action and others for almost two years. *See, e.g., Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373-DMM (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Popkin v. Citibank, N.A.*, No. 13-cv-60722 (S.D. Fla.)*; Lopez v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.). More than thirty depositions have been taken or used in those cases, and more than three million documents produced and reviewed. The Chase and Assurant Defendants also provided additional information to confirm the reasonableness of the Settlement's terms. [6] The fact that some of this evidence was obtained through informal methods

---

[6] "There is no precise yardstick to measure the amount of litigation that the parties should conduct before settling." *In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 WL 780512, at *13; *see also In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) ("[t]he Court need not find that the parties have engaged in extensive discovery"). The question instead is whether the parties have engaged in sufficient discovery and investigation to afford them an "adequate appreciation of the merits of the case," *In re Prudential Ins. Co. of Am. Sales Litig.*, 148 F.3d 283, 319 (3d Cir. 1998), such that the settlement is not "the product of uneducated guesswork," *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). The test is one of sufficiency—not sheer quantity—because "it would be inconsistent with the salutary purposes of settlement," *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir. 1986), "to find that extensive pretrial discovery is a prerequisite to approval," *Plummer v. Chemical Bank*, 668 F.2d 654, 660 (2d Cir. 1982). *See also, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (lack of formal discovery did not compel conclusion that insufficient discovery was conducted).

does not affect the ability of counsel to assess the strength and weaknesses of their respective positions. Courts have routinely approved settlements based upon information obtained by counsel through informal means. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001) ("although no formal discovery had taken place, the parties had engaged in an extensive exchange of documents and other information . . . thus, the stage of the proceedings' factor . . . weighed in favor of settlement approval") (internal citation omitted); *Corrugated Container Antitrust Litig.*, 643 F.2d at 211 ("The trial court may legitimately presume that counsel's judgment that they had achieved the desired quantum of information necessary to achieve a settlement is reliable.") (internal quotations and citations omitted); *Cotton*, 559 F.2d at 1332 ("Discovery in its most efficient utilization should be totally extra-judicial [and . . .] informality in the discovery of information is desired."); *McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006); *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 556-57 (S.D. Ohio 2000) (approving settlement in which counsel relied primarily on informal discovery); *Austrian & German Holocaust Litig.*, 80 F. Supp. 2d at 176 (same).[7]

### B. The Settlement Provides Considerable Benefits to the Class and Falls Squarely within the Range of Reasonableness.

As a result of this mediation process, the terms negotiated by the parties provide considerable benefits to the class, in terms of both monetary and injunctive relief, and fall well within the range of possible approval.

#### 1. Monetary Relief

The Settlement Agreement provides that all class members are eligible to receive 12.5% of the net premium paid or charged, for force-placed hazard insurance, in the form of either a check or a credit to their Chase escrow account. (Ex. A ¶ 4.5.) Defendants will accordingly reimburse class members for 12.5% of the annual premiums that they were charged or paid, less any refunds. (*Id.* ¶¶ 4.5.2, 4.5.3.) This amount will be 12.5% of the entire premium charged, some of which legitimately went to purchasing insurance coverage to which Chase was entitled

---

[7] Before settlement talks began, the parties also briefed and argued motions to dismiss by both groups of defendants and two motions to centralize force-placed litigation against the Chase and Assurant Defendants before a single district court judge in multidistrict litigation. *See Herrick*, No. 13-cv-21107 (S.D. Fla.); *In re Mortg. Lender Force-Placed Ins. Litig.*, MDL No. 2388 (J.P.M.L. 2012); *In re Chase Hazard LPI Litig.*, MDL No. 2465 (J.P.M.L. 2013).

to protect its interest in the borrower's property—*not* 12.5% of the premium charged in excess of the actual or competitive cost of coverage.  (*Id.*)

The 12.5% of the premium returned to class members here as recovery was recently approved as a reasonable rate reduction by more than forty-five state regulators as a new lender placed product.  These regulators have approved as reasonable a lender-placed hazard insurance product developed by Assurant that would reduce the rates used to calculate the premiums charged to lenders (and then passed in to borrowers) by up to 12.5% -- at the very most -- if the lender would agree to forego all  commissions and reinsurance profits that are the subject of this lawsuit.  This Settlement will provide all homeowners with that maximum discount.

Moreover, federal courts routinely hold that settlements providing the class with a percentage of the recovery sought in litigation are reasonable in light of the attendant risks of litigation.  *See, e.g., Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)); *Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) ("courts have determined that a settlement can be approved even if benefits amount to a small percentage of the recovery sought"); *Behrens*, 118 F.R.D. at 542-43 (approving recovery of $.20 per share where desired recovery was $3.50 a share because "the fact that a proposed settlement amounts to only a fraction of the possible recovery does not mean the settlement is inadequate or unfair") (citation omitted);  *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving settlement providing recovery of 0.2% of sales. "Moreover, when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson*, 2011 WL 4357376, at *12 (citation and internal quotations omitted).

Plaintiff and the class faced significant hurdles in litigating their claims to resolution, including certification of a multistate class, and overcoming Defendants' filed-rate doctrine defense.  Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement.  The monetary recovery negotiated by the parties falls well within the range of reasonableness.

### 2. Injunctive Relief

Once approved, the settlement terms will also enjoin the Chase and Assurant Defendants for a period of six years from accepting a financial interest in the placement of force-placed hazard policies beyond the premium itself and the protection afforded by the policy on the properties that serve as the collateral for the loans that they extend to borrowers. (Ex. A ¶ 4.2.1.) This means that the Chase Defendants will no longer collect, and the Assurant Defendants will no longer pay, *inter alia*, hazard LPI commissions to Chase-affiliated agents or brokers, revenue arising from quota-share reinsurance arrangements (which has provided the Chase Defendants more than $600 million in revenues during the Class Period), or payments for administrative or other services associated with placement of LPI hazard coverage.  (*Id.* ¶¶ 4.2.2, 4.3.1.)  Subject to certain conditions, Chase will also stop accepting below-cost or free outsourced services from the Assurant Defendants which were being subsidized by the inflated lender-placed insurance premiums, and will no longer place hazard LPI through its affiliated companies.  (*Id.* ¶ 4.2.2.) The Settlement Agreement effectively prohibits the Chase and Assurant Defendants from continuing to implement the practices complained of in the Complaint.  There can be no question that this result is reasonable.

### C. The Saccoccio Settlement Saves Plaintiff and the Class from Considerable Litigation Hurdles.

Any evaluation of the benefits of settlement must be tempered by the recognition that any compromise involves concessions by all settling parties.  Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Civil Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted).  Had litigation continued, Plaintiff and class members would have faced the risk of not prevailing on their claims.  This Court recognized at the May 16, 2013 hearing on the defendants' motions to dismiss that the defendants had "ma[de] some very good arguments" that could have ended a portion or more of the case at  summary judgment. (May 26, 2013 Hrg. Transcript at 12:23-25, 21:17-21, 92:2-3, 74:4-9, 92:21-23); *see also, e.g., Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) (declining to certify nationwide class of force-placed hazard borrowers and noting obstacles created by filed-rate doctrine and application of multistate law, among other things).  The proposed settlement saves Plaintiff and the proposed class from facing these significant obstacles, and eliminates the significant risk that they would recover nothing at all after several more years of litigation.

### D. Class Counsel Believes the Settlement Is Reasonable and in the Best Interest of the Class.

Finally, significant weight should be attributed to the belief of experienced counsel that the negotiated settlement is in the best interest of the class. *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 666 (D. Minn. 1974) (the recommendation of experienced counsel is entitled to great weight); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995). "The views of the parties to the settlement must … be considered." The firms offered as Class Counsel here have litigated numerous force-placed insurance class actions over the course of just under three years, and fully support the Settlement. They certified the first force-placed hazard insurance class in Florida in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), litigated the motion for class certification in *Kunzelmann*, briefed and argued two motions to centralize force-placed insurance litigation in a nationwide MDL, and are currently litigating four additional cases against other major mortgage lenders in the Southern District of Florida. *See Popkin*, No. 13-cv-60722, *Fladell*, 13-cv-60721, *Lopez*, No. 13-cv-21104, *Hall*, No. 12-cv-22700. Based on this experience, and decades of experience litigating consumer class action lawsuits, it is Plaintiff's counsels' informed opinion that, given the uncertainty and substantial expense of pursuing the Chase and Assurant Defendants on all claims throughout trial, the Settlement is fair, reasonable, adequate, and in the best interests of the Class.

## II. THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS.

"It is well established that a class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *In re Checking Account Overdraft Litig.*, 275 F.R.D. at 659 (internal quotations and citation omitted; brackets in original). "In deciding whether to provisionally certify a settlement class, a court must consider the same factors that it would consider in connection with a proposed litigation class," save manageability, "since the settlement, if approved, would obviate the need for a trial." *Id.* (citations omitted).

However, "[t]he standards of Rule 23 for class certification are more easily met in the context of settlement than in the context of contested litigation." *Horton v. Metropolitan Life Ins. Co.*, No. 93-1849-CIV-T-23A, 1994 U.S. Dist. LEXIS 21395, at *15 (M.D. Fla. Oct. 25, 1994); *see, e.g., White v. Nat'l Football League*, 822 F. Supp. 1389, 1402 (D. Minn. 1993) ("The requirements for class certification are more readily satisfied in the settlement context than when

16

a class has been proposed for the actual conduct of the litigation.") (citations omitted); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 157-58 (S.D. Ohio 1992) ("We agree that the proposed settlement must comply with Rule 23; however, courts have recognized that ... the requirements of Rule 23 may be more easily satisfied in the settlement context than in the more complex litigation context … The rationale behind the loosening of the requirements is to encourage sweeping settlements of complex disputes.") (internal citations and quotations omitted).  The Settlement Class here meets the requirements of numerosity, commonality, typicality and adequacy of representation required by Rule 23(a) of the Federal Rules of Civil Procedure, as well as the requirements of Rule 23(b)(3).

### A.  The Settlement Class Meets the Four Requirements of Rule 23(a).

Rule 23(a) sets forth four prerequisites for class certification:  numerosity, commonality, typicality, and adequacy of representation.  *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484,489 (S.D. Fla. 2003); *see* Fed. R. Civ. P. 23(a).  The policies underlying the class action rule dictate that Rule 23(a) should be liberally construed.  *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996).  Plaintiff satisfies all four requirements as set forth below.

### 1.  The Settlement Class Is Sufficiently Numerous That Joinder Would Be Impracticable.

Rule 23(a)(1) requires Plaintiff to show that the proposed class is so numerous that joinder of all members would be impracticable.  *See* Fed. R. Civ. P. 23(a)(1).  "While there is no fixed rule, generally a class size [of] less than twenty-one is inadequate, while a class size of more than forty is adequate." *Williams v. Wells Fargo Bank, N.A.*, 11-cv-21233, 2012 WL 566067, at *4 (S.D. Fla. Feb. 21, 2012) (citing *Cheney,* 213 F.R.D. at 489-90); *see, e.g., Anderson v. Bank of S., N.A.*, 118 F.R.D. 136, 145 (M.D. Fla. 1987) ("[T]he size of the class and geographic location of the would-be class members are relevant to any consideration of practicality."); *Checking Overdraft Litig.,* 2011 WL 3158998, at *2.

The proposed number of class members in this case well exceeds the minimum threshold recognized by the Eleventh Circuit.  *See Cox,* 784 F.2d at 1553.  The Chase Defendants sell and service millions of mortgage loans nationwide, and collect premiums from mortgagors in fifty states.  Assurant has placed approximately 1.3 million hazard Chase policies, and collected more than $2.4 billion in force-placed premiums from these mortgagors during the class period.   The numerosity requirement is clearly satisfied here.

17

## 2.   There Are Questions of Law and Fact Common to All Class Members.

Rule 23(a)(2) requires class action plaintiffs to identify questions of law or fact common to the class. *See* Fed. R. Civ. P. 23(a)(2).  "The threshold for commonality is not high." *Cheney,* 213 F.R.D. at 490 (citation omitted).  Commonality requires a showing that the class members' claims "depend on a common contention" and that the class members have "suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "[F]or purposes of Rule 23(a)(2), even a single [common] question will do[,]" *id.* at 2556 (brackets in original), and "where a common scheme of conduct has been alleged, the commonality requirement should be satisfied." *Checking Overdraft,* 2011 WL 3158998, at *4 (citation omitted); *see, e.g., Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 685-86 (commonality satisfied where defendant is alleged to have "engaged in a standardized course of conduct that affects all class members"); *Cheney,* 213 F.R.D. at 490 ("Where a common scheme is alleged, common questions of law or fact will exist.").

Plaintiff's claims here depend on the common contention that Defendants conceived and implemented a scheme to manipulate and artificially inflate force-placed insurance premiums that they would then charge to the borrower.  (D.E. 1).  All members of the putative class were injured in the same manner:  they were charged LPI hazard premiums that included inflated reinsurance and other costs, and as a result have paid or now owe amounts in excess of what their mortgage agreements allowed.  (*Id.*); *see Williams,* 2012 WL 566067, at *5 (finding commonality where plaintiffs had argued that "all members of the propose class were injured in the same manner, namely by being charged inflated premiums for the force-placed insurance).

Thus, while only one question of law *or* fact is required to establish commonality, several common questions capable of class-wide resolution—or that would "generate common answers"—arise from Plaintiff's allegations, including whether:

    a.   Defendants overcharged borrowers for force-placed insurance policies that included impermissible charges;

    b.   The premiums collected from consumers included charges to which Chase was not entitled under the contracts at issue;

    c.   Chase breached the implied covenant of good faith and fair dealing by entering into an exclusive arrangement with Assurant to place insurance policies on mortgagors' homes with artificially inflated premiums; and

    d.   Chase was unjustly enriched as a result of its policies and practices related to force-placed hazard insurance.

No individualized inquiry will be required to answer these questions.  For example, Defendants collected a percentage commission from all policies, or reinsured those risks, regardless of location or local practice.  Resolution of this question on the merits will stand or fall on whether the scheme alleged, in fact, exists and, as a corollary, whether Defendants' uniform practice impacted all mortgagors.  These common questions are capable of class-wide resolution.  *Compare Checking Overdraft,* 275 F.R.D. at 673-74 (commonality requirement met based on common scheme).  At this stage, the Court need only decide, based on whatever evidence is required, whether the question of Defendants' participation in a common scheme can be answered with respect to the entire class.  *See Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 687 ("Where the complaint alleges that the Defendants have engaged in a standardized course of conduct that affects all class members, the commonality requirement will generally be met.").

Similarly, whether Defendants were unjustly enriched by the alleged common scheme does not involve individualized inquiry.  To certify the class, the Court need not ask whether Defendants were unjustly enriched by the premiums charged to one mortgagor as opposed to another.  Either Defendants took unearned profits from a force-placed scheme that was applied uniformly across the class or they did not.  *See, e.g., Williams,* 2012 WL 566067, at *5 ( "The determination of the truth or falsity of the Plaintiffs' allegations that Wells Fargo and QBE engaged in a scheme to force-place insurance with inflated and excessive premiums will resolve an issue that is central to the validity of each one of the claims in one stroke.").

These questions are more than sufficient to satisfy the commonality requirement imposed by Rule 23(a)(2).

### 3.  Plaintiff's Claims Are Typical of Those of the Class.

Rule 23(a)(3) requires Plaintiff to demonstrate that his claims are typical of those held by the proposed class.  *See* Fed. R. Civ. P. 23(a)(3).  Typicality and commonality are related, with commonality referring to "the group characteristics of the class as a whole" and typicality focusing on the named plaintiff's claims in relation to the class.  *Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 686 n.23.  "Any atypicality or conflict between the named Plaintiffs' claims and those of the class must be clear and must be such that the interests of the class are placed in significant jeopardy." *Cheney,* 213 F.R.D. at 491.

Plaintiff's claims in this case arise from the same course of conduct and are based on the same legal theories as those brought on behalf of the proposed class. Plaintiff and every member of the proposed class took mortgage loans from Chase or its predecessors that were governed by common and materially uniform agreements. (D.E. 1 ¶¶ 5, 48.) As a result, once their voluntary policies lapsed, Plaintiff and every other member of the proposed class were charged artificially inflated force-placed insurance premiums by Defendants. (*Id.* ¶¶ 4, 6, 32, 45.) Plaintiff and the class seek redress through common claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, and violations of FDUTPA the federal Bank Holding Company Act, and TILA against Defendants. (*Id.* at ¶¶ 72-79, 80-86). Thus, the claims of Plaintiff and those belonging to the putative class arise from the same course of conduct and are based on the same legal theories, thereby satisfying Rule 23(a)(3). *See, e.g., Williams*, 2012 WL 566067, at *6 (holding that the named plaintiffs were "typical of the class in that they were both charged and either paid or still owe Wells Fargo for the alleged excessive and inflated premiums for the force-placed property insurance").

### 4.  Plaintiff and Plaintiff's Counsel Are Adequate Representatives.

To satisfy Rule 23(a)(4), the representative parties must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied when the class representatives have (1) no interests antagonistic to the rest of the class and (2) counsel who are "qualified, experienced, and generally able to conduct the proposed litigation." *Cheney*, 213 F.R.D. at 495. "Adequate representation is presumed in the absence of contrary evidence." *Association for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002).

### a.  Mr. Saccoccio Does Not Have Interests Antagonistic to the Rest of the Class.

Adequacy exists where a class representative shares common interests with the class and seeks the same type of relief for himself as he does for other class members. *See Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) ("Where the named plaintiffs in a class action are seeking the same type of relief for themselves as they seek for class members, the adequacy of representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure is satisfied."); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 600 (S.D. Fla. 1991).

The named Plaintiff in this action has no interest that is antagonistic to those held by the rest of the class. The class definition includes only individuals who were subjects of Defendants' force-placed hazard insurance scheme. (Ex. A ¶ 2.47.) All members of the class, including the

named Plaintiff, had hazard insurance policies placed on their homes and were charged inflated premiums that were added to the balance of their mortgage loans or taken from escrow.  (*Id.*) Thus, the critical issues in this case—the existence, implementation, and unlawfulness of Defendants' force-placed insurance scheme—are common to Plaintiff's claims and the claims of the class.  None of the class members benefitted from Defendants' practice of overcharging for force-placed insurance; the class representatives and absent members would have been better served had the premiums imposed been competitive and unmanipulated by the Defendants.  As Plaintiff proves his own claims, he will also be proving the claims of more than a million class members.  The Plaintiff and the proposed class members share a common goal:  to recover the excess charges that were added to their insurance premiums.  "If the Plaintiff[] succeed[s], the benefits will inure to all class members."  *Tefel,* 972 F. Supp. at 617.  Accordingly, Plaintiff has satisfied the requirements of Rule 23(a)(4).  *See Williams,* 2012 WL 566067, at *6-7.

   **b.  Plaintiff's Counsel Are Qualified, Experienced, and Generally Able to Conduct the Proposed Litigation.**

   The attorneys who seek to represent the plaintiff class in this case are highly qualified to serve as class counsel, have been investigating these claims for just under three years and have served as lead and co-lead counsel in some of the largest class actions in the country as well as insurance related complex cases.  There are three law firms that Plaintiff seeks to name as Class Counsel in this action – Kozyak, Tropin, & Throckmorton, P.A., Podhurst Orseck, P.A. and Harke Clasby & Bushman, LLP.  These firms have successfully prosecuted consumer class actions and their law firms are well respected in the communities that they serve.  "[T]he single most important factor considered by the courts in determining the quality of the representative's ability and willingness to advocate the cause of the class has been the caliber of the plaintiff's attorney."  1 NEWBERG ON CLASS ACTIONS 3d (1992) § 3.24 at 3-133 n. 353.  *See also Griffin v. Carlin*, 755 F. 2d 1516, 1533 (11th Cir. 1985) (question of adequacy of plaintiffs most often "involve[s] questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and of whether plaintiffs have interests antagonistic to those of the rest of the class").  The firms representing Plaintiff have overseen the litigation strategy, the briefing and argument of dispositive and other motions, and the vigorous pursuit of discovery.

**B.  The Settlement Class Meets the Requirements of Rule 23(b)(3).**

In addition to meeting the four requirements of Rule 23(a), a plaintiff seeking class certification must satisfy one subsection of Rule 23(b).  *Cheney,* 213 F.R.D. at 489.  Plaintiff here seeks certification under Rule 23(b)(3). Under Rule 23(b)(3), certification is appropriate if (1) common questions of law or fact predominate over those affecting only individual class members and (2) class treatment is superior to other adjudication methods.  *See* Fed. R. Civ. P. 23(b)(3).   The latter question implicates manageability concerns, and does not bear on certification of a settlement class. *See Checking Account Overdraft Litig.*, 275 F.R.D. at 659.

For common questions of law or fact to predominate over individualized questions, "the issues in the class action that are subject to generalized proof, and [are] thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof."   *Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. at 694 (citation omitted). "Common questions need only predominate; they need not be dispositive of the litigation." *Id.* (citation omitted).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Checking Overdraft Litig.,* 2011 WL 3158998, at *7 (citation omitted); *see, e.g., Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 725 (11th Cir. 1987).  The Eleventh Circuit has articulated the test for predominance as follows:

> [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered … If … the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Klay v. Humana, Inc.,* 382 F.3d 1241, 1255 (11th Cir. 2004).

Here, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Defendants'] scheme to" manipulate force-placed insurance premiums charged to Plaintiff and the proposed class. *Checking Overdraft Litig.,* 2011 WL 3158998, at *7 (citation and internal quotations omitted). Defendants' participation in this scheme may be substantiated by common evidence; evidence that would remain the same regardless of class size or composition.  Indeed, a finding of liability would require *no* proof regarding individual borrowers' properties or mortgage agreements with

the Chase Defendants.  Instead, Plaintiff would be required to show, *inter alia*, that: (1) the terms and obligations of Chase's mortgage contracts relating to force-placed hazard insurance were materially similar and uniform across the class; (2) Chase never purchases or writes insurance for an individual borrower, but instead, purchases a group Master Policy from the Assurant Defendants that provides continuous coverage for all loans held by Chase and automatically provides insurance coverage in the event any borrower/loan in the portfolio fails to provide required evidence of required insurance; (3) Chase contracted with the Assurant Defendants to provide servicing activities for Chase's entire loan portfolio at below cost; and (4) the Chase and Assurant Defendants enter into riskless "captive reinsurance" agreements that cycle a percentage of all force-placed hazard premiums back to Chase through a reinsurance affiliate.  (D.E. 1 ¶¶ 34-46).  Common issues would predominate over any individual issue that might arise.

Moreover, a comprehensive resolution of the class members' claims in this action would be far superior to litigating each of their claims separately, and will provide them a better chance at relief.  "Since the damage amounts allegedly owed to each individual [borrower] are relatively low—especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticate defendants—the economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits." *Williams*, 280 F.R.D. at 675.  Even if the class members were able to individually prosecute their claims, "[s]eparate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v, Tallant*, 710 F.2d 711, 718 (11th Cir. 1983).  Accordingly, the Court should certify the proposed settlement class.

## III.   THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE AND NOTICE PLAN.

Federal Rule of Civil Procedure 23(e)(1) provides that the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Class notice should be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  "Not only must the substantive claims be adequately described but notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998). (internal quotations and citation omitted). The Eleventh Circuit explained:

> The standard for adequacy of a settlement notice in a class action is measured by reasonableness. *See* Fed. R. Civ. P. 23(e). We have interpreted Rule 23 to require that class members be given "information reasonably necessary to make a decision [whether] to remain a class member and be bound by the final judgment or opt out of the action," though the notice need not include "every material fact" or be "overly detailed." … In fact, we have recognized that "an overly detailed notice: has the potential to "confuse class members and impermissibly encumber their rights to benefit from the action."

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (internal citations and footnote omitted).

The parties' proposed notice plan readily meets this standard. The Settlement Agreement provides that the Settlement Administrator shall distribute class notice by first-class mail in the form attached as Exhibit A to the Settlement Agreement to all identifiable members of the class no less than ninety days before the date set for a final approval hearing. (Ex. A ¶¶ 6.1, 6.3 & Ex. B at 81.) The Settlement also provides for internet notice and establishment of a toll-free number through which class members can acquire information about the settlement and also leave messages for Class Counsel. (*Id.* ¶¶ 6.5, 7.2.1 & Ex. B at 81-82.)

The notice itself, a copy of which is attached to the Settlement Agreement as Exhibit A, also satisfies the requirements of the Federal Rules. The proposed Notice provides, among other things, a clear definition of the Class; a description of the underlying lawsuit and the material terms of the Settlement; instructions as to how Class members may make a claim and determine whether they are eligible to do so; an explanation of class members' opt-out rights and a date by which Class members may opt out, and information regarding how to do so; instructions as to how to object to the Settlement and a date by which Class members may object; the date on which the Court will hold a Final Approval Hearing; and the internet address and toll-free number from which Class members may obtain additional information about the Settlement and its terms. (Ex. A at Ex. A.) The proposed claim form and instructions thereto also provide clear and comprehensive instructions as to who is eligible for relief and how to make a claim. (Ex. A at Ex. B.) The Court should approve the proposed Notice and Notice plan. *See, e.g., Pulley*, No. 12-cv-60936-JIC (S.D. Fla. Jun. 26, 2013) (D.E. 69) (approving notice plan providing for notice by mail, website, and toll-free number); *Smith*, 2010 WL 2401149, at *6 (approving notice that reasonably informed class of class, litigation, and

24

proposed settlement terms; costs and fees; how to participate; information about final approval; and instructions on opting out).

## IV.   THE COURT SHOULD APPOINT THE UNDERSIGNED FIRMS AS CLASS COUNSEL.

The parties have defined Class Counsel to include the three law firms of Kozyak Tropin & Throckmorton, P.A., Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP. (Ex. A ¶ 2.14.)   Plaintiff and undersigned counsel now move the Court to appoint these three firms as Class Counsel for the Settlement Class.   Undersigned counsel have significant experience litigating force-placed insurance class actions, having represented plaintiffs in seven different actions against five major mortgage lenders, the Assurant Defendants, and QBE, the other major force-placed insurer that contracts with major lenders to issue force-placed coverage.   Counsel's investigation into these claims began almost three years ago, and since that time, counsel has worked extensively with Birny Birnbaum, the foremost expert of force-placed insurance, taken significant discovery from the insurer and lender/servicer defendants, briefed and argued numerous dispositive motions, briefed and argued two motions to centralize these cases before a single district judge, and moved for certification of three mortgagor classes, including the settlement class here, among other things.

The undersigned firms also have considerable experience litigating nationwide and multistate class actions, including *LiPuma v. American Express, et al*, Case No. 04-cv-20314 (S.D. Fla.), *In re Managed Care HMO Litigation*, MDL No. 1334 (S.D. Fla.), and *In re Checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Fla.); and *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc.*, No. 10-cv-20715 (S.D. Fla.). Because undersigned counsel are highly qualified and determined to represent the best interests of the Class, the Court should appoint them Class Counsel moving forward.

## <u>CONCLUSION</u>

Plaintiff respectfully requests the Court enter an order certifying the proposed class for purposes of settlement, preliminarily approving the terms of settlement, and setting a Final Fairness Hearing at least 120 days after entry of the order.

Respectfully submitted this 6th day of September 2013.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Harley S. Tropin, Esq.<br>hst@kttlaw.com<br>Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiff* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiff* | |